UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CADET MANUFACTURING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN INSURANCE COMPANY, ROYAL INSURANCE COMPANY OF AMERICA f/k/a ROYAL GLOBE INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU, AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, NATIONAL SURETY CORPORATION, GRANITE STATE INSURANCE COMPANY, CENTURY INDEMNITY COMPANY, GREAT AMERICAN INSURANCE COMPANY, AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY,<br><br>Defendant. | Case No. C04-5411FDB<br><br>ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT REGARDING DUTY TO DEFEND, "TWO PREMISES LOCATION," INSURANCE LIMITS, and DENYING CROSS-MOTION ON NUMBER OF OCCURRENCES |

Cadet Manufacturing Company ("Cadet") seeks insurance coverage for claims brought against it by the Port of Vancouver, Washington ("Port") and the Washington Department of Ecology ("DOE") in connection with environmental contamination caused by the manufacturing

ORDER - 1

operations of predecessor Swan Manufacturing Company ("Swan").  Cadet faces liability claims as a result of environmental contamination discovered at the "Cadet" site, property formerly owned and operated by Swan, and for the operations of Swan that caused contamination at both the Swan and Cadet sites.

Cadet purchased four excess insurance policies from Granite State Insurance Company ("Granite State"), to cover claims exceeding the limits of the underlying primary coverage.  The insurer underlying Granite State's policies, Royal Globe Insurance Company ("Royal") has exhausted its coverage limits by paying those limits toward the settlement of the environmental claims against Cadet.[1]

Before the Court are various motions for partial summary judgment by Cadet against Granite State, including (1) motion for judgment confirming that Granite State's policies contain no aggregate limits and that the Granite State "stub" policy provides a separate set of per-occurrence limits; (2) motion for judgment that Granite State is jointly and severally liable to defend Cadet and that Granite State has breached its duty to defend[2]; and (3) motion for judgment confirming that the

---

[1] Pursuant to certain settlement agreements, the following claims have been dismissed with prejudice:  all of Cadet's claims against American Guarantee and Liability Insurance Company, Royal Insurance Company of American f/k/a Royal Globe Insurance Company, Employers Insurance Company of Wausau, American Guarantee and Liability Insurance Company, Fireman's Fund Insurance Company, National Surety Corporation and Agricultural Excess and Surplus Insurance Company; all counterclaims against Cadet and all cross-claims (except those asserted against Granite State); all cross-claims by and between Great American Insurance Company and American Guarantee and Liability Insurance Company, Royal Insurance Company of America f/k/a Royal Globe Insurance Company, Employers Insurance Company of Wausau, American Guarantee and Liability Insurance Company, Fireman's Fund Insurance Company,  National Surety Corporation and Agricultural Excess and Surplus Insurance Company.

[2] Defendant Century Indemnity Company, without endorsing all the arguments made by Cadet in its motion, joins in Cadet's motion for judgment declaring that Granite State has a joint and several obligation to defend and pay defense costs with the date of the exhaustion of the property damage limits in the Royal policies.  Great American joins in Cadet's argument and the holding in *Weyerhauser Co. v. Commercial Union Co.*, 142 Wn.2d 654, 690, that "once the underlying insurer has paid its limits in settlement or judgments, the [excess] insurer's obligation to defend arises."

ORDER - 2

Swan Site and the Cadet Site are "two premises locations," and therefore, each a separate "occurrence" for purposes of determining the insurance limits available under the Granite State policies.[3] Also before the Court is Granite State's cross-motion for partial summary judgment that Cadet's insurance coverage reflects a single "occurrence."

The Court, finding that these legal issues may be decided upon the written briefs and evidence submitted by the parties, and having considered the motions, cross-motions, opposition briefs, summary judgment evidence, and balance of the record, finds that Cadet's motions for partial summary judgment should be granted.

## I.

*Factual Background*

The facts underlying the coverage disputes are largely undisputed. Since 1957, Cadet has been a leading manufacturer of electric heating equipment used in residential and commercial construction. Cadet is a Washington corporation and has been headquartered in Vancouver, Washington since 1972. Cadet is emerging from a Chapter 11 bankruptcy proceeding and operating under a Third Amended Plan of Reorganization (the "Plan"), which was confirmed in January 2000. Cadet is the subject of environmental liability claims in connection with two sites (hereinafter the "Underlying Claims") as follows:

**1.    The Swan Site and the Port of Vancouver's Claims**

Swan operated a manufacturing facility in Vancouver, Washington from sometime in the 1950's through approximately 1964. In 1964, Swan moved its operations to the site of the current Cadet facility, also in Vancouver. In 1972, Cadet purchased Swan's assets and liabilities and consolidated the operations of the two companies at the Vancouver facility (i.e., the site at which

---

[3]Defendant Century joins in Cadet's motion to the extent it seeks partial summary judgment that the Swan Site and the Cadet Site constitute separate "premises locations" under the Granite policies.

ORDER - 3

Swan was operating in 1972, which is the same site as Cadet's current manufacturing facility).

In 1982, the Port of Vancouver purchased the site at which Swan had operated between the 1950's and 1964 (the "Swan Site"). In 1999, the Port discovered soil and groundwater contamination at the Swan Site, including contamination of the groundwater by TCE. The Port and Cadet were identified as potentially liable parties ("PLP") by DOE. The Port, as the current owner of the site, has taken the lead in dealing with the DOE and investigating and planning for the remediation of the site.

The main procedural vehicle for Cadet's liability is the Port's claims asserted against Cadet in its Chapter 11 bankruptcy proceeding. First, the Port has asserted a contribution claim against Cadet under the Model Toxics Control Act, RCW § 70.105D, et. seq. ("MTCA"). Second, the Port has asserted a common-law trespass claim against Cadet, claiming that contaminants from the current Cadet facility have migrated to the Port's property, including the Swan Site, and that those migrating contaminants constitute a trespass against the Port. Cadet and the Port have litigated these claims over the past three years. The case is set for trial in November 2005, before Judge Snyder of the United States Bankruptcy Court.

**2.     The Cadet Site and the Department of Ecology's Claims**

The second underlying environmental claim relates to Cadet's current facility in Vancouver, Washington. In 1999, solvent contamination was detected in the soil and groundwater in the vicinity of the current Cadet facility. The DOE identified Cadet as a PLP, and as a result Cadet conducted a thorough investigation of the site. This investigation, and extensive negotiations with the DOE, resulted in an Agreed Order, pursuant to which Cadet is remediating the site.

**3.     Insurance Coverage**

Granite State is an excess carrier to Cadet's primary insurance carrier, Royal Globe Insurance Company ("Royal") for the time period September 21, 1978 to March 28, 1982. During this period, Granite State issued four excess policies to Cadet with each having a $2,000,000.00 per occurrence

ORDER - 4

property damage limit.  Each Granite State policy attaches after the exhaustion of the underlying Royal policies.

In 1999, Cadet tendered the Underlying Claims to its primary and excess insurers, including Royal, who agreed to defend under a reservation of rights.  In addition, the primary carriers made indemnity payments, including a $2,500,000.00 environmental claims settlement to the Port and funded ongoing remediation at the Cadet Site under an Agreed Order with the DOE.

On or about July 28, 2004, Royal notified the parties in this and the underlying litigation that it had exhausted its policy limits on its putative polices via indemnity payment to Cadet.  In sum, Royal made the following payments: $840,564,82, Port of Portland settlement; $16,161.78 Swan Site costs; and $682,440.30 Cadet Site costs.

By October 20, 2004, all the primary carriers claimed exhaustion of their respective property damage policy limits.  However, Cadet pressed its primary carrier for additional payments based upon Personal Injury Liability ("PIL") coverage.  Cadet and its insurers, excluding Granite State, reached a settlement of the PIL coverage in December 2004.

In December 2004, Cadet's primary insurers, Great American and Century Indemnity Company entered into a Settlement Agreement wherein the parties expressly deemed certain dates when the underlying primary policies were exhausted and excess insurer's defense obligation began.  Granite State refused to agree to the reasonableness of the payments or the cessation of a defense and/or indemnity obligation.  The primary insurers sought and obtained a court order on the reasonableness of the settlement and obtained a contribution claim bar.  Granite State did not file any opposition to the motion and consented to entry of the order.

II.

*Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the moving

ORDER - 5

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©).  Summary judgment is not proper if material factual issues exist for trial.  <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995), *cert*. *denied*, 516 U.S. 1171 (1996).

If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts which show a triable issue.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986).  Summary judgment is proper if the moving party shows that there is no evidence which supports an essential element to the non-moving party's claim.  <u>Celotex</u>, 477 U.S. 317 (1986).  The substantive law governs whether a fact is material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

### III.

*Aggregate Limits/Per Occurrence*

In this motion, Cadet seeks a judgment confirming that:

A.      Cadet's Granite State policies contain no aggregate limits for property-damage claims; and

B.      Granite State's "stub" policy provides a separate set of $2 million insurance limits.

**A. Aggregate Limits for Property-Damage Claims**

The Granite State policy language governing the available limits under the policies is as follows:

> [Granite State] shall only be liable for the ultimate net loss, the excess of either:
>
> (a)      the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurance, or
>
> (b)      the amount as set out in the declarations as the self-insured retention in respect of each occurrence not covered by said underlying insurances,
>
> (Hereinafter called the "Underlying Limits");

ORDER - 6

> And then only up to a further sum as stated in Item 3(a) of the Declarations [$2,000,000] in all in respect to each occurrence, subject to a limit as stated in Item 3(b) of the Declarations [$2,000,000] in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employee of the assured.

Cadet relies upon the Supreme Court of Washington's interpretation of nearly identical policy language in *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, P.3d 115 (2000), a case involving insurance coverage for environmental cleanup facilities functionally identical to those at issue here. After it incurred environmental liabilities at up to 130 sites nationwide and had settled with all of its insurers except Commercial Union, Weyerhauser looked to its excess policy with Commercial Union, which defined the applicable coverage limits as follows:

> $1,500,000 in the aggregate for each annual period during the currency of this Policy, separate in respect of Products Liability and separately in respect to Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

The Supreme Court of Washington rejected Commercial Union's argument that the above language created an annual aggregate limit for not only products liability and personal injury claims, but also property damage claims. The Court held, instead, that if there are multiple occurrences within an annual period, the plain language of the policy does not limit the insured's aggregate recovery for property damage or other types of loss aside from products liability and personal injury. *Id*. at 663-64.

In all relevant respects, the policy language at issue here is identical to that in *Weyerhaeuser*. Accordingly, there is no question that Cadet's policies contain no aggregate limits on property-damage claims and Granite State must pay Cadet up to $2,000,000 for every covered occurrence of property damage during its policy periods.

### B. Insurance Limits of Stub Policy

Cadet purchased three consecutive one-year insurance policies from Granite State (9/21/78 -

ORDER - 7

9/21/79; 9/21/79 - 9/21/80; and 9/21/80 - 9/21/81).  Upon expiration of the third policy, Cadet purchased a six-month policy extension from Granite State at a premium for $2,000.00 (40% of the $5,000.00 premium Cadet paid for its 1980-81 annual policy).  This policy extension extended the terms of Cadet's most recent policy in exchange for a pro-rated premium.  The policy does not mention prorating its per-occurrence limits.  The extension is a simple endorsement stating that the expiration date of the policy is extended and that "all other terms and conditions of the policy shall remain the same."

When it purchased the "stub" policy, Cadet contends, it purchased a "fresh set" of per-occurrence limits for the stub period.  In the absence of a Washington court that has addressed whether stub policies provide fresh insurance limits, Cadet looks to authority in the Seventh Circuit (*University of Ill. v. Insurance Corp. of Ireland*, 969 F.2d 329 (7th Cir. 1992) (interpreting Illinois law), the Second Circuit (*Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2nd Cir. 1995) (interpreting New York and Texas law)), and New Jersey (*United States Mineral Products Co. v. American Ins. Co.*, 792 A.2d 500 (N.J.App. 2002)), all of whom held that stub policies provide new limits where the policyholder paid a prorated premium for a policy extension. These courts looked to the "one item of totally objective evidence, the premium itself," and reasoned that in exchange for the reduction in premiums, the insurers received a reduction in the amount of time they were at risk.  In addition, the courts noted that there was nothing in the language of the extension policies providing for proration of the policies' limits.

Granite State relies on *UNR Industry, Inc. v. Continental Ins. Co.*, 1988 U.S. Dist. LEXIS 12561 (N.D. Ill. Nov. 9, 1988), a case which held that a similar policy extension did not create a fresh set of limits.   However, the Court agrees with Cadet that the reasoning of *UNR Industry* case is inconsistent with the realities of an occurrence-based policy.

Rather, the Court is persuaded by the reasoning applied in *Mineral Products*, *Stonewall*, and *University of Illinois*.  There is nothing in the language of the policy extension providing for

ORDER - 8

prorated limits for policy periods shorter than one year and, in exchange for a reduction in the premium, Granite State received a reduction in the amount of time it was at risk. More importantly, is the possibility that the original policy might have been exhausted by occurrences which had not yet manifested themselves in property damage when the stub policy was issued. Essentially, that means Cadet would have paid a premium in exchange for no additional coverage. It makes more sense that the proration of the premium reflects the shortened length of time for which the insurer is exposed to the risk of loss, not a reduced quantum of protection available if the risk materializes in the stub period, however short it may be. *See, e.g., Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 762 F.Supp. 566 (S.D.N.Y. 1991), *aff'd in part, ref'd on other grds*, 4 F.3d 1049 (2d Cir. 1993); *Mineral Products*, 792 A.2d at 525.

Accordingly, Cadet's stub policy provides a full set of separate $2-million-per-occurrence limits.

IV.

*The Duty to Defend*

Once the underlying insurer has paid its limits in settlements or judgments, the excess insurer's obligation to defend arises. *Weyerhaeuser*, 142 Wn.2d at 690 (citations omitted). In considering an environmental insurance coverage dispute very similar to that at issue in this case, where Weyerhaeuser had settled with its primary insurer and claimed that its excess insurer was required to step in and continue Weyerhaeuser's defense, the Washington Supreme Court agreed, reasoning that:

> The duty to defend and the duty to indemnify are distinct obligations, the former being broader. An excess insurer's obligation to defend is generally defined by the excess policy. Here, the [excess] policy is silent regard CU's duty to defend. But an excess insurer's duty to defend may also arise when: (1) the claim is covered under the language of the excess policy; (2) the excess policy does not expressly eliminate any defense obligation; and (3) the coverage and obligations of the underlying insurers have been validly exhausted . . . .

ORDER - 9

> The majority of jurisdictions adhere to the following rule: once the underlying insurer has paid its limits in settlements or judgments, the [excess] insurer's obligation to defend arises.

*Id.*

If an excess insurer were required to defend before exhaustion of an underlying carrier's duty, then the "primary carrier would profit from its wrongful failure to defend. *Id.* (citing *Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co.*, 76 Wash.App. 527, 531, 887 P.2d 455 (1995)).

Granite State does not dispute that it has a defense obligation because of the exhaustion of primary coverage. It disputes that its defense obligation arose with the dates specified in the Settlement Agreement, contending instead, that its obligation arises only when the last primary insurer physically made the payment called for by the Settlement Agreement. Granite State is unwilling to pay defense costs for approximately eight months (the dates set forth in the Settlement Agreement to the date of final primary insurer payment). In the eight month interim, Granite State contends that those defense costs must be borne by Cadet's other excess insurers, Century and Great American, who entered into the Settlement Agreement. Granite State further argues that this Court should require horizontal exhaustion of all primary policies.

The Court finds no authority to support Granite State's unique argument that its obligation did not arise until the last primary insurer physically made its last payment under the Settlement Agreement. There is no dispute that the claims against Cadet are covered under the terms of the Granite State policies and that the Granite State policy expressly includes a duty to defend "upon reduction or exhaustion of the aggregate limits of liability under said underlying insurances."

The evidence shows that on or about July 28, 2004, Royal notified the parties in this and the underlying litigation that it had exhausted its policy limits on its putative polices via indemnity payments to Cadet. In sum, Royal made the following payments: $840,564.82 in the Port of Portland settlement; $16,161.78 in Swan Site costs, and $682,440.30 in Cadet Site costs. By

ORDER - 10

October 20, 2004 all the primary carriers claimed exhaustion of their respective property damage policy limits, but also paid additional amounts based on settlement of Cadet's claim for personal injury liability. Royal made an additional payment of $500,000 to settle that issue. In December 2004, Cadet's primary insurers, Great American and Century Indemnity, entered into a Settlement Agreement wherein the parties expressly deemed certain dates when the underlying policies were exhausted and excess insurer's defense obligation began. Granite State consented to entry of this Order.

Finally, each of the Granite State policies requires that Cadet exhaust only the "underlying insurances" before its coverage is triggered. The "underlying insurances" are the Royal policies and the underlying claims both trigger Granite States's Property Damage coverage. Granite State appears to concede that Cadet properly exhausted its Property Damage coverage under the Royal policies as of July 28, 2004, when Cadet received Royal's final payment.

Accordingly, it cannot be reasonably disputed that Granite State should have begun defending Cadet once the underlying Royal property-damage policy limits were exhausted by indemnity payments since July 28, 2004.[4]  The Court is also unpersuaded by Granite State's proposal that the Court should require horizontal exhaustion of all primary insurers because to do so flies in the face of the terms of Granite State's own policies and Washington's law of joint and several liability among insurers of a continuous loss. *See, e.g. Weyerhaeuser*; *Port of Seattle v. American Nat. Fire Ins. Co.*, 1998 U.S. Dist. LEXIS 23038 (January 27, 1998).

V.

*Two Premises/Number of Occurrences*

The Granite State policies define the amount of insurance coverage available to Cadet in

---

[4]Notwithstanding Granite State's reference to the possibility of discovering new primary insurance (a reference not supported by evidence), it is not relieved of its past and current coverage obligations under its contract with Cadet.

ORDER - 11

relevant part as follows:

> II. LIMITS OF LIABILITY. The Company shall only be liable for the ultimate net loss, the excess of either:
>
> (a) The limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or
>
> . . .
>
> And then only up to further sum as stated in Item 3(a) of the Declarations in all in respect of each occurrence, subject to a limit as stated in Item 3(b) of the declarations in the aggregate for each annual period during the currency of this Policy.
>
> * * *
>
> 5. OCCURRENCE. The term "Occurrence" wherever used herein shall mean an accident, or a happening, or event, or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same conditions existing at or emanating from one premises location shall be deemed one occurrence.

The policies at issue do not define the term "one premises location."

Under Washington law, undefined terms in an insurance contract must be given the plain, ordinary and popular meaning *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990). To determine the ordinary meaning of an undefined term, [Washington] courts look to standard English language dictionaries. *Id*. Clear and unambiguous policy language must be enforced as written. *Washington Public Utils. Dists. System v. Public Util. Dist. No. 1*, 112 W.2d 1, 10, 771 P.2d 70 (1989). An insurance policy term is ambiguous if the language, on its face, is fairly susceptible to two different interpretations, both of which are reasonable. *American Nat'l Fire Ins. Co. v. B&L Trucking & Const. Co., Inc.*, 134 W.2d 413, 428, 951 P.2d 250 (1998). If a clause is ambiguous, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. *Id*. at 428. Any ambiguities remaining are resolved against the insurer and in favor of the insured. *Weyerhaeuser*, 142 Wash.2d at 666, 15 P.3d at 122.

ORDER - 12

The material facts are not in dispute.[5] The Swan Site is 1,000 feet away from the Cadet Site. The sites are not contiguous. The Swan Site is south of West Fourth Plain Boulevard and the Cadet Site is north of West Fourth Plain Boulevard. The Cadet site is also west of the Swan Site. The two sites are not connected and manufacturing operations were never conducted at the sites at the same time. After Swan terminated its lease at the Swan Site, it moved to the Cadet Site.

As part of its manufacturing of electric heaters, Swan operated a degreasing unit utilizing trichloroethylene (TCE) to degrease parts before they were painted. Swan operated this degreasing unit on the Swan Site through 1964. Swan continued to use the identical equipment after 1964, when it moved to the Cadet site. Swan's use of TCE as a degreasing agent terminated in approximately 1965, long before Cadet acquired Swan in 1972.

From 1954 to 1982, the Swan Site was leased to various restaurants. The last known occupant was Raggs Tavern. In 1982, the Port of Vancouver purchased the Swan Site.

Cadet is now liable for costs to remediate the TCE contamination arising from Swan's use of TCE in the operation of the degreasing unit. Remediation is in progress under two Agreed Orders. The first is an Agreed Order between the DOE and the Port (which now owns the Swan Site) and the second Agreed Order is between the DOE and Cadet (for the Cadet Site).

An "Interim" Remedial Action Plan is in place to contain the contamination of the commingled plume that lies under the Cadet and Swan sites and surrounding area. This system consists of a soil vapor extraction system and a number of recirculating groundwater wells.

Granite State contends that because the release of TCE was continuous and repeated and

---

[5]As Granite State concedes, insurance policies are construed as contracts and interpreted as a matter of law. *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 423-24, 932 P.2d 1244 (1997). Granite State argues, however, that if the Court is not prepared to grant summary judgment under its "cause theory," a genuine issue of material fact exists because Cadet did not submit evidentiary facts to contradict the theory. The Court is not persuaded by this reasoning. A material issue of fact is not raised by a party's use of it to "fit" a particular theory. Moreover, as discussed in more detail later, application of the "cause theory" does not preclude a finding of two premises.

ORDER - 13

came from a single degreasing unit operated by Cadet's predecessor and resulting in contaminated groundwater, it must be interpreted as a single "occurrence" under Washington law. Cadet argues that the plain and ordinary meaning of "one premises location," means that the Swan Site and the Cadet Site, which are separate parcels on which manufacturing operations never took place at the same time, are two premises locations.

The Court does not find Granite State's analysis of the "occurrence" language to be persuasive on this issue. Granite State relies on two reported cases in which the policies at issue contained the identical "occurrence" language contained here. However, the premises location of the occurrence were not at issue. For example, in a case involving multiple claims of discrimination, the Court found that a new occurrence did not occur each time an employee was discriminated against; instead, the employer's adoption of the discriminatory policy constituted a single occurrence. *Appalchian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3rd Cir. 1983). In *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325 (N.D.Tex. 1980), the court similarly found that a company's pattern of discrimination constituted a single occurrence under the insurance policy. Granite State also finds no help in the unreported cases it cites. A New Jersey superior court found that although numerous individuals suffered injuries, there was only one occurrence because the cause of injury was the manufacture and sale of a particular injury-causing product. *Westinghouse Electric Co. v. American Home Assurance Co.*, 2004 WL 1878764 (N.J. Super.). In *Domtar, Inc. v. Niagara Fire Insurance Co.*, 2004 WL 376951 (Minn.App.), the court held that environmental contamination at geographically and geologically distinct sites were not a single occurrence. The plaintiff in *Domtar* relied on a number of product liability cases, which involve the manufacture and distribution of defective products, in an attempt to support its claim that the damages at all of its sites should be aggregated and considered one occurrence. However, the court was not convinced that the product liability cases supported Domtar's position that environmental contamination at multiple geographic sites, some of which are located hundreds of miles apart, can be considered as a single

ORDER - 14

occurrence.  The court looked to several environmental contamination cases specifically rejecting this proposition, including <u>Endicott Johnson Corp. v. Liberty Mut. Ins. Co.</u>, 928 F.Supp. 176, 180-81 (N.D.N.Y.1996) (repeated dumpings at landfill and at barrel reconditioning site constituted two occurrences); <u>Pub. Serv. Co. v.. Wallis & Cos.</u>, 986 P.2d 924, 938 (Colo.1999) (affirming trial court's finding, which was based on record support, that there was single continuous "occurrence" at each site).

The Court rejects Granite State's claim that Cadet's activities (although identical as to release of TCE), at its geographically distinct sites are one occurrence.  The Court also rejects Granite State's argument that a finding of a continuous "occurrence" and a finding of two premises locations are mutually exclusive.  Cadet's liability has one cause, i.e., the release of TCE.  Those releases occurred first by Cadet's predecessor Swan from 1964 until 1971 at the Swan Site and since 1971, by Cadet at the Cadet Site, the release of which has resulted in contamination of groundwater and subsurface soil on and underneath the Cadet Site and through migration, the Swan Site.   Just as the insurer in *Endicott* disposed of tons of waste at two dump sites over a period of time, Cadet has released quantities of TCE at two sites over a period of time.  While arguably each release of TCE can be considered an "occurrence" causing property damage, it is more reasonable to conclude that they all derived from one occurrence at each site.   The evidentiary facts presented by Granite State confirm that each such release occurred under "substantially the same conditions," in that the release of TCE was continuous and repeated and came from a single degreasing unit operated by Cadet's predecessor on one site and then operated by Cadet on another.

To reach Granite State's conclusion that the existence of substantially same occurrences transforms two physical locations into one, however, requires the Court to ignore the plain language of the policy which goes on to qualify the definition of occurrence as "existing or emanating from one premises location."

ACCORDINGLY,

ORDER - 15

IT IS ORDERED:

(1) Plaintiff's motion for partial summary judgment that Granite State's policies contain no aggregate limits and that the Granite State stub policy provides a separate set of per-occurrence limits (Dkt.#113) is **GRANTED**;

(2) Plaintiff's motion for partial summary judgment that Granite State is jointly and severally liable to defend Plaintiff and pay defense costs commencing with the date of exhaustion of the property damage limits in the Royal policies and that Granite State has breached that duty (Dkt.#116) is **GRANTED**;

(3) Plaintiff's motion for partial summary judgment that the Swan Site and the Cadet Site are "two premises location," and therefore, each a separate "occurrence" for purposes of determining insurance limits (Dkt.#135) is **GRANTED**; and

(4) Granite State's cross-motion for partial summary judgment that Cadet's insurance coverage reflects a single "occurrence, (Dkt.#152) " is **DENIED**.

DATED this 5th day of October, 2005.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 16