1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

12

13

14

15

16

17

18

19

20

21

22

CADET MANUFACTURING COMPANY,

        Plaintiff,

     v.

AMERICAN INSURANCE COMPANY,
ROYAL INSURANCE COMPANY OF
AMERICA f/k/a ROYAL GLOBE
INSURANCE COMPANY, EMPLOYERS
INSURANCE COMPANY OF WAUSAU,
AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY,
FIREMAN'S FUND INSURANCE
COMPANY, NATIONAL SURETY
CORPORATION, GRANITE STATE
INSURANCE COMPANY, CENTURY
INDEMNITY COMPANY, GREAT
AMERICAN INSURANCE COMPANY AND
AGRICULTURAL EXCESS AND SURPLUS
INSURANCE COMPANY,

        Defendants.

Case No. C04-5411 FDB

ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
GRANITE STATE INSURANCE
COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
RE: NO OCCURRENCE

23

24

25

     This matter comes before the Court on Plaintiffs Cadet Manufacturing Company (Cadet) and

the Port of Vancouver, U.S.A. (Port), as assignee of Cadet's claims against Granite State, motion for

26

ORDER - 1

1   summary judgment declaring Granite State Insurance Company (Granite State) has a duty to

2   indemnify Plaintiffs under insurance policies issued by Granite State to Cadet.  Plaintiffs further seek

3   a declaration that Granite State is obligated to pay all unsatisfied amounts of the Settlement

4   Agreement between the Plaintiffs and two excess insurers, Century Indemnity Company and Great

5   American Insurance Company, that are not the responsibility of another party, with prejudgment

6   interest.

7          Defendant Granite State has moved for partial summary judgment seeking dismissal of

8   Plaintiffs claims for insurance coverage on the basis that no property damage occurred during the

9   policy periods and therefore there was no occurrence.  In the alternative, Granite State requests a

10  determination that coverage is limited to the policy limits for one occurrence.

11         After reviewing all materials submitted by the parties and relied upon for authority, the Court

12  is fully informed and hereby grants Plaintiffs' motion for summary judgment and denies Granite

13  State's motion for partial summary judgment.

14                    **INTRODUCTION AND BACKGROUND**

15         This matter arises out of a declaratory judgment action commenced by Cadet against various

16  primary and excess insurers who issued commercial general liability (CGL) policies to Cadet.  Cadet

17  (and its assignee, Port) seeks indemnification for environmental liabilities arising out of its

18  manufacturing operations at the "Cadet" and "Swan" sites.  The actions underlying this coverage

19  action have been settled; all insurers have settled and have been dismissed from this case, except

20  Granite State.  The settlement has been found reasonable and approved by this Court by order dated,

21  April 13, 2006.  On previous motions for partial summary judgment ,this Court determined that (1)

22  Granite State must pay Cadet up to $2,000,000 for every covered occurrence of property damage

23  during its policy periods, (2) including the six-month stub policy period, (3) Granite State had a duty

24  to defend Cadet once the underlying property-damage policy limits were exhausted, and (4) the Cadet

25  and Swan manufacturing sites are separate sites of contamination and each a separate occurrence for

26  ORDER - 2

1   purposes of determining insurance limits.  Cadet Manufacturing Co. v. American Insurance Co., _et_

2   _al._, 391 F. Supp.2d 884 (W.D. Wash., 2005).

3          The history of the operation of manufacturing facilities and contamination of the Swan and

4   Cadet sites is set forth in this Court's previous order.  See, Cadet Manufacturing Co., at 887-88.

5   Stated briefly, Cadet's predecessor, Swan operated a manufacturing facility (Swan Site) from

6   approximately 1956 through approximately 1964.  In 1964, Swan moved its operations to the site of

7   the current Cadet facility (Cadet Site).  In 1972, Cadet purchased Swan's assets and liabilities and

8   continued operations at the Cadet Site.  In 1982, the Port purchased the Swan Site.

9          In approximately 1998, the Port discovered soil and groundwater contamination, primary

10  trichloroethylene (TCE) contamination, at the Swan Site.  The Washington Department of Ecology

11  (DOE) identified the Port and Cadet as potentially liable parties responsible for remediation of the

12  environmental damages pursuant to the Model Toxics Control Act, RCW § 70.105D, _et. seq._

13  (MTCA).

14         In 1999, solvent contamination was detected in the soil and groundwater in the vicinity of the

15  Cadet Site manufacturing facility.  The DOE identified Cadet as the potentially liable party and as a

16  result of subsequent investigation and negotiations, Cadet and the DOE entered into an Agreed

17  Order, pursuant to which Cadet is responsible for remediation of the site.

18         The environmental contamination was caused by ongoing operations at the two facilities that

19  spanned many years.  Release of TCE at the Swan Site began in the 1950s and continued until 1964

20  when the Swan Site operations were transferred to the Cadet Site.  The release of TCE from the

21  Cadet Site occurred from 1964 through 1971, when Cadet discontinued use of its degreaser unit.

22  The release of TCE resulted in contamination of groundwater and subsurface soil at both sites.

23         In 1999, Cadet filed a Chapter 11 bankruptcy petition.  On January 18, 2000, the Bankruptcy

24  Court confirmed a plan of reorganization that provided that the only assets available for satisfaction

25  of Cadet's environmental liabilities were the proceeds of its insurance policies.  The plan allowed

26  ORDER - 3

1    Cadet to settle the environmental claims subject to court approval.  The Port asserted a common law

2    trespass claim and a contribution claim under the MTCA against Cadet.

3            Cadet tendered the defense of the claims by the DOE and the Port to its insurers that

4    provided commercial general liability policies and excess policies in prior years.  Cadet and the

5    primary insurers entered into a settlement agreement that was approved by order of the Bankruptcy

6    Court.  The primary insurers agreed to pay Cadet over $4 million and their policies were deemed to

7    be exhausted.  Cadet, the Port and the excess carriers began negotiations as to the issue of past and

8    future costs incurred by the Port to remediate the contaminated sites.  A settlement was reached

9    between all parties, except Granite State.  Over the opposition of Granite State, the Bankruptcy

10   Court approved the settlement with the excess insurers.  This Court reviewed the settlement and

11   entered an order approving the settlement barring claims against the settling insurers.

12           The settlement provides that the Port's claim against Cadet is allowed in the amount of $20

13   million, plus $4 million estimated cost of completing the Cadet Site remediation.  The Port agrees to

14   purchase the Cadet Site, take responsibility for remediation and indemnify Cadet for any costs

15   related to remediation of the soil and groundwater at the Cadet and Swan Sites.  The settling excess

16   carriers agreed to pay the Port a total of $10, 000 million, $6 million in satisfaction of the Port's

17   claim and $4 million for remediation at the Cadet Site.  A claims bar protects the settling insurers

18   from claims for contribution and indemnity by the non-settling insurer, Granite State.  Cadet assigns

19   to the Port the coverage claim against Granite State to recover (1) the remaining unpaid remediation

20   costs of the Port's claim, (2) unpaid defense and indemnity amounts for the Cadet Site, and (3)

21   contribution claim for past Cadet Site indemnity costs paid by the settling insurers but which are the

22   responsibility of Granite State.  In total, the settlement agreement provides Granite State's coverage

23   liability at a minimum of $15,678,961.

24           Granite State provided Cadet excess insurance coverage for the time period September 21,

25   1978 to March 28, 1982.  During this period, Granite State issued four excess policies to Cadet,

26   ORDER - 4

each having a $2 million per occurrence property damage limit.  By prior order the Court determined

the  contamination at the Swan and Cadet sites are separate occurrences and have no aggregate

limits.  Cadet Manufacturing Co. V. American Insurance Co., *et al.*, 391 F. Supp.2d 884 (W.D.

Wash., 2005).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the

opposing party must show that there is a genuine issue of material fact for trial.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).   A dispute as to a material fact is

"genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The opposing party may not rest

upon the mere allegations or denials of the moving party's pleading, but must present significant and

probative evidence to support its claim.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

1551, 1558 (9th Cir. 1991).  For purposes of this motion, reasonable doubts as to the existence of

material facts are resolved against the moving party and inferences are drawn in the light most

favorable to the opposing party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

Summary judgment is mandated where the facts and the law will reasonably support only one

conclusion.

## INSURANCE COVERAGE

**"Property Damage"**

Granite State asserts that no property damage occurred during its policy periods and thus

there was no occurrence triggering coverage.  Granite State dos not dispute the release of TCE from

ORDER - 5

the Swan and Cadet sites caused property damage that remained in the subsoil and groundwater throughout the Granite State insurance policies.  Granite State nonetheless, argues that there was no property damage during its policy periods because the groundwater contamination plume had achieved a steady state by 1977; prior to the issuance of the Granite State policies.  Granite State contends that coverage is premised on new damage taking place during the policy period.

It is undisputed that the Granite State policies provide coverage for "occurrences" resulting in "property damage" occurring during the respective policy periods.  The Insuring Agreements provide that Granite State agrees, subject to limitations, to indemnify Cadet for all sums which Cadet shall be obligated to pay  by reason of liability imposed upon Cadet by law for damages on account of property damage caused by or arising out of each occurrence happening anywhere in the world.  The term "Occurrence" is defined as "an accident, or happening, or event, or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in ... property damage ... during the policy period."  "Property Damage" is defined as "physical injury to or destruction of tangible property, which occurs during the policy period, including loss of use thereof at any time resulting therefrom..."

Accordingly to Granite State, the term "Property Damage" requires the creation of damages during the policy period, not just the existence of damaged property.  The policy definition simply provides for **"physical injury to ... property, which *occurs* during the policy period** ..."   The term "occurs" is not defined in the policy.

In Washington, insurance policies are liberally construed to provide coverage for the insured whenever possible. Mercer Place Condo. v. State Farm, 104 Wn. App. 597, 602-03, 17 P.3d 626 (2000).  Undefined terms are given their plain, ordinary, and popular meanings. Panorama Village v. Allstate Ins. Co., 144 Wn.2d 130, 131, 26 P.3d 910 (2001).  If the plain meaning is not clear, a dictionary definition can be used for clarification. State Farm v. English Cove Ass'n, 121 Wn. App.

ORDER - 6

358, 363, 88 P.3d 986 (2004).  In standard dictionaries the term "Occur" has two definitions: **(1) to be found or met with**: **appear : exists**, and **(2) to present itself : come to pass : take place : happen**.  Webster's Third New International Dictionary of the English Language, Unabridged. Merriam-Webster (2002).  Thus under standard definitions, there are two possible interpretations: (1) There is "Property Damage" under the policies when there is "physical injury or destruction of tangible property which [appears][exists] during the policy period, or (2), There is "Property Damage" under the policies when there is "physical injury or destruction of tangible property which [takes place][happens] during the policy period.

Looking at the policy, the language is, at the least, fairly susceptible to different, reasonable interpretations and accordingly, it is ambiguous.  An insurance clause is ambiguous "when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable."  American Nat. Fire Ins. Co. v. B & L Trucking and Const. Co., Inc., 134 Wn.2d 413, 428, 951 P.2d 250 (1998).  Any ambiguities are resolved against the insurer and in favor of the insured.  Id.  The average person purchasing insurance would construe the policy language to provide indemnity for property damage that exists during the policy period.  Because the language is, at the least, ambiguous, and because there is no extrinsic evidence from the record indicating an intent by both parties to exclude coverage, the Court finds there was "property damage" during the periods of the Granite State policies as that term is defined in the policies of insurance.

An additional basis for finding coverage is Washington's adoption of the "continuous trigger" or "continuous damage" rule for determining insurance coverage for ongoing environmental contamination.  B & L Trucking, at 425; Time Oil Co. v. Cigna Property & Cas. Ins. Co., 743 F. Supp. 1400, 1417 (W.D. Wash., 1990).   Under the continuous trigger approach, all insurance policies in effect during periods of ongoing damaged are triggered, not just the insurance policy that was in effect at the commencement of the initial property damage.  B & L Trucking, at 425.

The contamination at the Swan and Cadet sites commenced prior to the effective dates of the Granite State policies and continued throughout the periods of coverage.  Groundwater is not in a static state.  The contaminates in the subsoil and groundwater migrate with the movement of the groundwater.  The continuous and repeated exposure of soil and groundwater to TCE constitutes continuing property damage. Thus there is continuing property damage and a continuous triggering of coverages.

**"Neither Expected or Intended"**

As previously noted, the Granite State policy language defines "occurrence" as "an accident, or happening, or event, or a continuous or repeated exposure to conditions which ***unexpectedly and unintentionally results in ... property damage*** ... during the policy period."  To be an "occurrence," a harmful event must be "neither expected nor intended from the standpoint of the insured to result in property damage. In other words, property damage that is expected or intended by the insured does not warrant coverage.  <u>Overton v. Consolidated Ins. Co.</u>, 145 Wn.2d 417, 425, 38 P.3d 322 (2002).  The inquiry focuses on the subjective intent of the insured and whether the insured expected or intended the injury or damage.  <u>Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.</u>, 126 Wn.2d 50, 70-71, 882 P.2d 703, 891 P.2d 718 (1994).

Plaintiffs have presented testimony of employees stating unequivocally that Swan and Cadet did not intend property damage to result from the use and handling of TCE.  There is additional testimony that during the operations of Swan and Cadet, the adverse environmental effects of TCE were generally unknown.  Granite State's evidence does not refute this testimony. Defendant merely refers to testimony concerning later-learned knowledge of the dangers of TCE.

There is no material issue of fact that the damage resulting form the release of TCE was intended or expected from the standpoint of the insured.

**Conclusion**

ORDER - 8

Granite States's motion for summary judgment re: no occurrence will be denied.  There is no material issue of material fact putting coverage in issue.  Cadet has coverage for the underlying claims under it's Granite State policies of insurance.  Granite State is required to indemnify Plaintiffs under the insurance policies issued to Cadet.

## NUMBER OF OCCURRENCES

Granite State issued four excess policies to Cadet, each having a $2 million per occurrence property damage limit.  By prior order, this Court determined the  contamination at the Swan and Cadet sites are separate occurrences and have no aggregate limits.  Cadet Manufacturing Co. V. American Insurance Co., et al., 391 F. Supp.2d 884 (W.D. Wash. 2005).  Coverage is triggered for every policy in force during which property damage occurred.  See, American Nat. Fire Ins. Co. v. B & L Trucking and Const. Co., Inc., 134 Wn.2d. 413, 425, 951 P.2d 250 (1998); Time Oil Co. v. Cigna Property & Cas. Ins. Co., 743 F. Supp. 1400, 1417 (W.D. Wash., 1990).  Thus, it would appear that Cadet has $16 million in coverage under it's Granite State policies: four policies of coverage for the Swan site with $2 million per occurrence limits and four policies of coverage for the Cadet site with 2 million per occurrence limits.

Granite State contends that only the occurrences at the Swan site are at issue and thus, the policy limits are 8 million.  Granite State premises this argument on the assertion that the Cadet site occurrences have been satisfied and do not apply to the Port's underlying claims for remediation of the Swan site.

Granite State's argument is flawed.  The underlying claim by the Port against Cadet is for contamination at the Swan site and for contamination migrating from the Cadet site onto Port property.  Contamination of the Swan site is attributable to releases of TCE from both the Swan and the Cadet sites.  Thus, the property damage to the Swan site is the result of occurrences from each site.  Granite State's interpretation of the settlement is unpersuasive.

ORDER - 9

Cadet has coverage for both the Swan and cadet sites.  This consists of four policies of coverage for each site, for total limits of coverage of $16 million.  Plaintiffs are entitled to indemnification up to the limits of coverage, $16 million.

### SETTLEMENT AND AMOUNT OF COVERAGE

In Washington**,** when an insurer refuses to settle a claim, the insured and the claimant may negotiate a settlement on their own.  Red Oaks Condominium Owners Ass'n v. Sundquist Holdings, Inc., 128 Wn. App. 317, 322, 116 P.3d 404 (2005); Chaussee v. Maryland Cas. Co., 60 Wn. App. 504, 509-10, 803 P.2d 1339, 812 P.2d 487 (1991).  The insurer is be liable for the settlement amount to the extent that it is reasonable.  Red Oaks Condominium Owners Ass'n, at 322; Chaussee, at 510.  Thus, it is common for parties to move for a hearing to determine the reasonableness of settlement agreements.  Red Oaks Condominium Owners Ass'n, at 322; Besel v. Viking Ins. Co., 146 Wn.2d 730, 738-39, 49 P.3d 887 (2002).  Once a settlement has been determined to be reasonable, the burden shifts to the insurer to show that it is the product of fraud or collusion. Besel, at 739.  Where the insurer does not meet this burden, it is liable for the full settlement amount.  Id.

The Bankruptcy Court and this Court have determined the Settlement Agreement reasonable.  Granite State presented argument against the reasonableness of the settlement in the Bankruptcy Court and this Court.  These arguments were rejected.  The finding of reasonableness is settled.

Granite State, nonetheless asserts it is not bound by the Settlement Agreement and that it is entitled to litigate and defend itself from liability.  The Settlement does not prevent Granite State from contesting coverage (liability).  Granite State has done so in this summary judgment proceeding.

Under Washington law, all insurers providing coverage during any portion of the total time period of continuing damage are jointly and severally liable for all damages.  American Nat. Fire Ins.

ORDER - 10

1    Co. v. B & L Trucking and Const. Co., Inc., 134 Wn.2d 413, 424-25, 951 P.2d 250 (1998).   Under

2    this rule, Granite State is responsible for all costs of the underlying claim in excess of the primary

3    insurance up to policy limits.  Granite State has put forth no argument supporting an underpayment

4    or allocation of costs among insurers.  The Settlement Agreement incorporates an allocation of risk

5    that has been determined fair and reasonable.

6         Granite State is responsible for indemnification of the unsatisfied amounts of the Settlement

7    Agreement, up to the limits of its coverages.

8                              **PREJUDGMENT INTEREST**

9         In Washington, prejudgment interest is granted to compensate a party for the loss of use of

10   money to which he was entitled.  Hadley v. Maxwell, 120 Wn.App. 137, 141, 84 P.3d 286 (2004);

11   Jones v. Best, 134 Wn.2d 232, 242, 950 P.2d 1 (1998).  Prejudgment interest is favored in the law

12   because it promotes justice. Hadley, at 142: Prier v. Refrigeration Eng'r Co., 74 Wn.2d 25, 34, 442

13   P.2d 621 (1968).   The claim need not arise out of contract or any specific cause of action; but it is

14   available (1) when an amount claimed is 'liquidated' or (2) when the amount of an 'unliquidated'

15   claim is for an amount due upon a specific contract for the payment of money and the amount due is

16   determinable by computation with reference to a fixed standard contained in the contract, without

17   reliance on opinion or discretion.  Hadley, at 141-42; Prier, at 32; Seattle-First Nat. Bank v.

18   Washington Ins. Guar. Ass'n, 94 Wn.App. 744, 759-760, 972 P.2d 1282 (1999).  "A claim is

19   liquidated if data in the evidence makes it possible to compute the amount with exactness, without

20   reliance on opinion or discretion."  Hadley, at 142; Lakes v. von der Mehden, 117 Wn.App. 212,

21   217, 70 P.3d 154 (2003).  It is widely acknowledged that a settlement made in an underlying civil

22   action represents a liquidated amount with regard to the subsequent indemnity claim.  King County

23   v. Puget Sound Power & Light Company, 70 Wn.App. 58, 62, 852 P.2d 313 (1993).

24

25

26   ORDER - 11

1   Granite State asserts it cannot be subject to prejudgment interest because coverage and

2   allocation are still at issue.  However, a dispute over liability does not convert a liquidated claim into

3   an unliquidated claim.  The defendant's claim that he or she is not liable for part or all of the

4   plaintiff's liquidated damages will not preclude a successful plaintiff from receiving prejudgment

5   interest. Hadley, at 143-44; Prier, at 33; Weyerhaeuser Co. v. Commercial Union Ins. Co., 142

6   Wash.2d 654, 685, 15 P.3d 115 (2000).  "The defendant's belief that he or she never owed the

7   money in the first place has never been an excuse for avoiding interest on a liquidated claim."

8   Hadley, at 143; Prier, at 34; Colonial Imports v. Carlton N.W., Inc., 83 Wn.App. 229, 247, 921 P.2d

9   575 (1996).  A liquidated claim remains so even if the defendant is partially successful in reducing his

10  or her share of liability. Hadley, at 144; Weyerhaeuser, at 685; Prier, at 33.  It is the character of the

11  claim and not of the defense that is determinative of the question whether an amount of money sued

12  for is a liquidated sum.  Hadley, at 144; Weyerhaeuser, at 686.

13  Granite State's liability has been fixed.  The settlement made in the underlying civil action

14  represents the liquidated amount with respect to the indemnity claims.  Accordingly, Cadet is entitled

15  to an award of prejudgment interest.

16  **CONCLUSION**

17  For the reasons set forth above, Defendant Granite States Insurance Co's otion for partial

18  summary judgment will be denied.  Plaintiffs Cadet Manufacturing Company and Port of Vancouver

19  are entitled to summary judgment declaring (1) the policies of insurance issued by Granite State

20  Insurance Company to Cadet provide coverage for the underlying claims, (2) the Settlement

21  Agreement establishes the measure of damages of the underlying claim, (3) Granite State is liable for

22  the unsatisfied amounts of the Settlement Agreement and (4) Granite State owes prejudgment

23  interest on the liquidated unsatisfied Settlement Agreement.

24  ACCORDINGLY,

25

26  ORDER - 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

IT IS ORDERED:

1.  Defendant Granite State Insurance Company's Motion for Partial Summary Judgment Re: No Occurrence [Dkt. #279] is **DENIED**.

2.  Plaintiffs' Motion for Summary Judgment  [Dkt. #274] that (1) the policies of insurance issued by Granite State to Cadet provide coverage for the underlying claims, (2) the Settlement Agreement establishes the damages for the underlying claims, (3) Granite State is liable for the unfunded amounts of the Settlement Agreement to the full extent of its coverage limits and (4) Cadet is entitled to prejudgment interest on the liquidated amount of the unfunded Settlement Agreement is **GRANTED.**

DATED this 26th day of July, 2006.

_____
FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 13